**WEILAND, GOLDEN
SMILEY, WANG EKVALL & STROK, LLP**
Jeffrey I. Golden, State Bar No. 133040
jgolden@wgllp.com
Hutchison B. Meltzer, State Bar No. 217166
hmeltzer@wgllp.com
650 Town Center Drive, Suite 950
Costa Mesa, CA 92626
Telephone:  714-966-1000
Facsimile:  714-966-1002

Proposed Attorneys for Debtor
North Valley Mall, LLC, a California limited liability
company

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| NORTH VALLEY MALL, LLC, a California limited liability company,<br><br>Debtor. | Case No. 8:09-bk-19346-TA<br><br>Chapter 11<br><br>**EMERGENCY MOTION FOR ORDER: (1) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363(c) THROUGH NOVEMBER 30, 2009; AND (2) REQUIRING TURNOVER OF POST-PETITION RENTS; MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF DAVID KLEIN IN SUPPORT**<br><br>**DATE:    October 8, 2009**<br>**TIME:    11:00 a.m.**<br>**CTRM:   5B** |

North Valley Mall, LLC ("Debtor"), debtor and debtor-in-possession in the above

caption case, submits this Motion for Order: (1) Authorizing the Use of Cash Collateral

Pursuant to 11 U.S.C. § 363(c) Through November 30, 2009; and (2) Requiring Turnover

of Post-Petition Rents to the Debtor ("Motion"), the attached declaration of David Klein in

support, and the following memorandum of points and authorities:

343216.1

MOTION

I.    **INTRODUCTION**

By this Motion, the Debtor requests the use of cash collateral on an interim basis pending a final hearing on cash collateral use through November 30, 2009, in order to pay the necessary expenses associated with the maintenance and management of its principal property.  The interests of the secured creditor are protected with respect to the proposed use of cash collateral because new rent is being generated, adequate protection payments will be made, the secured creditor will receive replacement liens, and the value of the subject property is not declining.  The secured creditor is also protected by a large equity cushion.  The proposed use of cash collateral is necessary to preserve the value of the property, continue business operations, and maximize the value of the estate.

II.    **FACTUAL BACKGROUND**

A.    **The Property**

North Valley Plaza ("Property") is a shopping center located in Chico, California, with a total area of 33,550 acres, of which 243,800 square feet is leasable.  It is characterized in the commercial real estate industry as a retail "power center" because of its size and of the type and size of its tenants.  The Property's primary tenants include Trader Joe's, Dollar Tree, Michael's, a Cinemark movie theater, and, prior to December 2008, Mervyn's.

North Valley Mall, LLC (the "Debtor"), was formed in 2004 for the purpose of purchasing and operating the Property.  Upon completing the purchase, the Debtor remodeled the Property for the purpose of increasing the gross leasable area and updating the existing improvements.

Even without a tenant in the Mervyn's space, according to a recent draft appraisal conducted by CB Richard Ellis ("Appraisal") and dated May 20, 2009, the Property has a

1  value of $28,250,000.[1]  A copy of the Appraisal is attached as Exhibit "1."  The Debtor is

2  currently in negotiations regarding the Mervyn's space.  Any disposition of the Mervyn's

3  space would greatly increase the value of the Debtor's assets.

4  **B.    The Secured Debt**

5      To accomplish the remodel, on July 30, 2004, the Debtor obtained a construction

6  loan from KeyBank, N.A ("KeyBank") with an original principal amount of $18,500,000 (the

7  "Loan") secured by the Property and an assignment of rents (the "Assignment of Rents").

8  On September 28, 2005, KeyBank agreed to increase the principal amount of the Loan to

9  $26,250,000.

10      The original maturity date of the Loan was August 1, 2006.  Pursuant to multiple

11  extension agreements, the maturity date was extended to October 1, 2008.

12      In connection with the extension agreements, the Debtor executed a lockbox

13  account agreement ("Lockbox Agreement"), whereby the Property's tenants were to pay

14  rent directly into a lockbox account ("Lockbox").  A copy of the Lockbox Agreement is

15  attached as Exhibit "4."  Under the Lockbox Agreement, KeyBank would receive payments

16  from the Lockbox in an amount to satisfy its monthly debt service under the Loan, and the

17  Debtor would receive all remaining funds in the Lockbox.  KeyBank, over time,

18  increasingly restricted the Debtor's access to the Lockbox.  Pursuant to an amendment to

19  the Lockbox Agreement dated January 2, 2008, the Debtor no longer received all funds in

20  the Lockbox exceeding KeyBank's debt service, and instead only received enough to

21  cover its monthly operating expenses.  A copy of this amendment is attached to the

22  Lockbox Agreement in Exhibit "4."  KeyBank retained the right, in its sole discretion, to

23  deny payment to the Debtor for any of its operating expenses.  Subsequently, as

24

25  _____

26    [1] The Debtor is in the process of obtaining an updated appraisal.  The Debtor is informed and believes
that KeyBank obtained an appraisal around the same time as the CB Richard Ellis appraisal which shows an
27  even higher value.

28

1  discussed further below, KeyBank froze the Lockbox completely and did not allow any

2  funds to be released.

3      **C.**      <u>**Events Preceding the Bankruptcy Filing**</u>

4      Due to the current state of the real estate and credit markets, the Debtor was

5  unable to make the balloon payment due on October 1, 2008, and KeyBank issued a

6  notice of default.  KeyBank froze the Lockbox and the Debtor has not been receiving any

7  funds therefrom.  The principals of the Debtor have been paying approximately $30,000

8  per month of the Debtor's operating expenses out of their own funds for over 18 months.[2]

9      After it was frozen by KeyBank, the Lockbox continued to accumulate funds.  By

10  September 1, 2009, the Lockbox had an approximate balance of $900,000.  In July, 2009,

11  KeyBank withdrew funds from the Lockbox to pay property taxes owed on the Property.

12      On June 26, 2009, the Debtor and KeyBank executed a forbearance agreement

13  (the "Forbearance Agreement"), whereby KeyBank agreed to forbear from enforcing its

14  rights with respect to the Debtor's default under the Loan.  In the Forbearance Agreement,

15  KeyBank acknowledged the outstanding amount of the Loan to be $24,531,573.02.  The

16  Forbearance Agreement expired on August 15, 2009.  After multiple continuances, a

17  foreclosure sale was scheduled for September 3, 2009.  While the Debtor thought

18  KeyBank was negotiating a restructuring agreement in good faith, without notice to the

19  Debtor, on or about August 25, 2009, KeyBank "swept" the Lockbox, withdrawing all but

20  approximately $36,000.  The Debtor is currently analyzing whether it has any claims

21  against KeyBank.

22      **D.**      <u>**The Commencement of the Bankruptcy Case**</u>

23      In order to maximize value for all of the Debtor's creditors and parties in interest, on

24  September 2, 2009 (the "Petition Date"), the Debtor filed a voluntary petition for relief

25  under chapter 11.

26  _____

27      [2] The Debtors will seek approval, by a separate motion, of an administrative loan for post-petition
expenses paid prior to authorization of cash collateral use.

28

**III.   PROPOSED TERMS OF CASH COLLATERAL USE AND DISCLOSURES**

**REQUIRED BY FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001**

**A.   Disclosures**

Pursuant to Federal Rule of Bankruptcy Procedure 4001, the Debtor makes the following disclosures with respect to the proposed use of cash collateral:

1.   The only entity known by the Debtor with an interest in cash collateral is KeyBank.

2.   The purpose of the use of cash collateral is to make the minimum expenditures required to operate, protect, and maintain the Property to prevent a decline in value due to neglect, and to pay administrative expenses of the bankruptcy estate in accordance with the proposed budget attached as Exhibit "2" ("Budget").

3.   The terms, including duration, of the use of cash collateral are as follows: the Debtor seeks authority to use cash collateral in accordance with the Budget through and including November 30, 2009, with expenditures during this period not to exceed 110% of the aggregate expenditures set forth in the Budget, *i.e.*, a 10% variance.

4.   KeyBank will receive perfected replacement liens, in accordance with its priority, in the Debtor's post-petition assets and the proceeds thereof, to the same extent, validity, and priority as the liens held by KeyBank as of the Petition Date (not including, for example, proceeds of avoidance actions), limited to the amount of any cash collateral as of the Petition Date, to the extent cash collateral is actually used by the Debtor, and monthly adequate protection payments in an amount equal to $85,000 per month, which is in excess of the current non-default interest rate under the Loan.

5.   During the proposed cash collateral period, KeyBank will receive payments that are based on an interest rate of 4%, which is above the current non-default contract rate.

6.   The Debtor will provide KeyBank with copies of the monthly operating reports.

343216.1

MOTION

1      Further, notwithstanding the Assignment of Rents and the Lockbox Agreement, all

2  post-petition rent payments shall be made by the tenants of the Property to the Debtor.

3      As required by Federal Rule of Bankruptcy Procedure ("FRBP") 4001(b) a copy of

4  the proposed form of order (the "Proposed Order") is attached to the Motion as Exhibit "3."

5      **B.**    <u>**The Budget**</u>

6      The Budget provides for the payment of the minimum expenditures required to

7  operate, protect, and maintain the Property to prevent a decline in value due to neglect

8  and to ensure that the Property continues to generate income, including payment of the

9  property manager, Parks Diversified.[3]  The Budget also provides for the payment of the

10  administrative expenses of the estate, including professional and U.S. Trustee's fees.  The

11  payments to professionals are in the nature of post-petition retainers which may be

12  applied only pursuant to separate Court order regarding the fees of the professionals.

13  **IV.**    <u>**CAUSE EXISTS TO HEAR THE MOTION ON AN EMERGENCY BASIS AND TO**</u>

14      <u>**AUTHORIZE THE USE OF CASH COLLATERAL PENDING A FINAL HEARING**</u>

15      A court may not approve the use of cash collateral, on a final basis, on less than 15

16  days after service of the motion.  Fed. R. Bank. P. 4001(b)(2).  Nonetheless, the court

17  may approve the interim use of cash collateral to the extent necessary "to avoid

18  immediate and irreparable harm to the estate pending a final hearing."  *See id.*

19      Good cause exists to hear the Motion on an emergency basis because the Debtor

20  needs authority to use cash collateral to pay operating expenses,   Accordingly, there is

21  cause to hear this Motion on an emergency basis, and authorize interim use of cash

22  collateral pending a final hearing.

23

24

25

26  _____

27  [3] The property manager, Parks Diversified, is an affiliate of the Debtor and will only be paid pursuant to a notice of insider compensation.

28

## V.   CASH COLLATERAL USE SHOULD BE AUTHORIZED ON THE PROPOSED TERMS

### A.   KeyBank's Interest is Adequately Protected

Section 363(c) provides that a trustee or debtor-in-possession may not use cash collateral, unless secured parties consent, or the court, after notice and a hearing, authorizes the proposed use. *See* 11 U.S.C. § 363(c). A bankruptcy court may authorize a debtor's use of cash collateral with the consent of a secured creditor provided the secured creditor's interest in such cash collateral is adequately protected. *See* 11 U.S.C. § 363(c) and (e); *see also In re Zeeway Corp.*, 71 B.R. 210, 211 (B.A.P. 9th Cir. 1987). However, a secured creditor is entitled to adequate protection only from the decline in value of its collateral package post-petition. *See In re Timbers of Inwood Forest*, 484 U.S. 365, 633 (1988); *see also In re Weinstein*, 227 B.R. 284, 296 (B.A.P. 9th Cir. 1998) ("[T]he amount by which the collateral depreciates is the amount of adequate protection to which the secured creditor is entitled."). "However, the protection afforded to secured creditors is not absolute." *In re ProAlert, LLC*, 314 B.R. 436, 441 (B.A.P. 9th Cir. 2004).

### B.   Cash Collateral Use Should Be Authorized to Pay Operating Expenses

Where, as here, cash collateral is used to maintain real property, the interests of secured creditors with liens on the real property as well as cash collateral, are adequately protected, even if the secured creditor was undersecured (*i.e.*, no equity cushion), which it is not. *See In re Donato*, 170 B.R. 247, 256 (Bankr. D. N.J. 1994) ("The use of cash collateral to pay the operating expenses of the real property in question adequately protects the interest of secured lenders, however, even where the creditor is undersecured."); *see also In re Pine Lake Village Apartment Co.*, 16 B.R. 750, 756 (Bankr. S.D.N.Y. 1982) ("Manifestly, the application of the rent income solely to maintain and repair the property so as to prevent further deterioration will enhance the value of the property which serves as the collateral for the plaintiff-mortgagee's claim. The protection and maintenance of the plaintiff-mortgagee's collateral, without any diversion of funds to the debtor, clearly ensures that the plaintiff-mortgagee's investment is adequately

protected."); *In re 499 W. Warren Street Associates, Ltd. Partnership*, 142 B.R. 53, 56

(Bankr. N.D.N.Y. 1992) ("A secured creditor's interest in the collateral itself is adequately

protected when a portion of the rents are applied to its operation and maintenance.").

Secured creditors are also adequately protected where income is being generated

and the used cash is replaced by new receipts or rents from operations.  As stated by one

bankruptcy court:

> With regards to rents, a court must look to the stream of future
> rents to determine whether adequate protection is required.
> This is because the lien on each month's rents replaces the
> lien on the prior month's rents, so there is a replacement lien of
> equal value under Section 361 of the Bankruptcy Code.
> Therefore, as long as the debtor generates a continuous
> income stream, the debtor's use of the rental income does not
> diminish the value of the collateral.  The rationale is that the
> protected cash proceeds are being used to generate new
> collateral which will be of at least equivalent value of those
> replaced. Accordingly, if the underlying collateral is not
> declining in value, the additional cash collateral may be used
> by the debtor to pay administrative expenses as well as to
> maintain and improve the underlying collateral.

*In re Wrecclesham Grange, Inc.*, 221 B.R. 978, 981 (Bankr. M.D. Fla. 1997)

(citations omitted); *see also In re 499 W. Warren Street Associates, Ltd. Partnership*, 142

B.R. at 57 (stating that a secured creditor's interest in rent is adequately protected when

the rents are reinvested for operational expenses and maintenance because such

reinvestment generates additional rents); *In re Ledgemere Land Corporation*, 116 B.R.

338, 343 (Bankr. D. Mass. 1990) (stating that a secured creditor is adequately protected

so long as the receivables being collected and used by the debtor are being replaced by

sufficient new receivables in which the creditor is granted a security interest).

Here, the proposed use of cash collateral is appropriate and should be authorized

because KeyBank is adequately protected.  First, the use of cash collateral to pay the

necessary and reasonable expenses to preserve and maintain the value of the Property *in*

*and of itself* constitutes adequate protection.  The Debtor requests authority to use cash

collateral to pay essential expenses, such as, utilities, insurance, and expenses needed to

maintain and repair the Property.  As the holiday shopping season approaches, there can

1  be no real dispute that it is necessary for a retail "power center" such as the Property to

2  pay these expenses.  Without the proposed use of cash collateral, utilities will be

3  terminated, insurance will expire, tenants will leave (resulting in a decrease in tenant rent),

4  and the overall value of the Property will likely decrease due to neglect.  In contrast, the

5  Debtor's use of cash collateral to operate and maintain the Property prevents deterioration

6  of the Property's value, and, thus provides adequate protection.  *See in re 499 W. Warren*

7  *Street Assoc., Ltd. Partners.*, 142 B.R., at 58; *see also In re Pine Lake Village Apt. Co.*, 16

8  B.R. at 756.  The expenses set forth in the Budget are all expenses that KeyBank would

9  have to pay if it owned the Property.  If these expenses are paid, the value of KeyBank's

10  interest in cash collateral will not decline during the cash collateral use period.

11  Second, KeyBank is adequately protected by replacement liens in the Debtor's

12  post-petition rents.  The Debtor's proposed use of cash collateral will generate additional

13  rents post-petition of at least equivalent value to those rents used pursuant to the Budget.

14  Therefore, the proposed use of cash collateral will not diminish the value of KeyBank's

15  collateral.

16  Third, KeyBank is further protected by the monthly adequate protection payments

17  to KeyBank in an amount equal to the non-default rate of interest provided in the Loan

18  documents.[4]

19  Finally, KeyBank is protected by a substantial equity cushion in the Property.  As

20  the Appraisal shows, even without a tenant in the Mervyn's space, the Property has a

21  value of $28.25 million.  The outstanding principal amount of the Loan is approximately

22  $24,453,067, leaving equity of $3,796,933 and an equity cushion of 13.4%.  *See In re*

23  *McGowan*, 6 B.R. 241, 243 (Bankr. E.D. Pa. 1980) ("equity cushion" as low as 10% is

24  adequate protection of creditor's interest, especially when the debtor is also making

25  monthly interest payments on the debt).  There is no evidence that the value of the

26

27  [4] The Debtor reserves the right to dispute the amount of the adequate protection payment, including with respect to the principal amount of the Loan and the interest rate.

28

1  Property has declined since the Appraisal.  Considering this fact, combined with the fact

2  as stated above that the Debtor is making monthly interest payments to KeyBank,

3  KeyBank's overall interest in the Property is adequately protected.

4  **C.    Cash Collateral Use Should Be Authorized to Pay Administrative**

5  **Expenses**

6      Provided that a secured creditor's interest in collateral is adequately protected, §

7  363 permits a debtor to use that collateral to pay other expenses, including administrative

8  expenses.  *See Matter of James Wilson Associates,* 965 F.2d 160, 171 (7th Cir. 1992)

9  ("So its liens are affected by bankruptcy. But is it permissible to bite into them in order to

10  pay attorney's fees and to protect the interest of another, but junior, secured creditor? We

11  think so, given the oversecured character of Metropolitan's claim. A security interest is a

12  security interest. It is not a fee simple."); se*e also Proalert*, 314 B.R. at 444 ("The plain

13  language of § 363 allows a debtor to use cash collateral if the secured creditor's interest is

14  adequately protected.").  It is not necessary for the secured creditor or its collateral to

15  directly benefit from the proposed use.  *See id.* (citing *In re Triplett*, 87 B.R. 25, 27 (Bankr.

16  W.D. Tex. 1988)("cash collateral may be used 'for the general benefit of the estate and

17  need not be devoted exclusively to the protection of the creditor or the collateral'")).

18  Further, to be adequately protected a secured creditor's equity cushion is not required to

19  remain constant.[5]  *See In re Delta Resources, Inc.*,  54 F.3d 722, 730 (11th Cir. 1995)

20  ("[W]e hold that an oversecured creditor's interest in property which must be adequately

21  protected encompasses the decline in the value of the collateral only, rather than

22  perpetuating the ratio of the collateral to the debt."

23

24

25
_____

26  [5] The administrative expenses proposed to be paid during the cash collateral period total $120,000.
This would only reduce the equity cushion from $3,796,933 to $3,676,933, or from 13.44% to 13.02%, an
27  insignificant decline of 0.42%.

28

1    Because KeyBank's interest will be adequately protected by interest payments,

2    replacement liens and, most importantly, a substantial equity cushion, the Debtor is

3    entitled to use cash collateral for to pay administrative expenses.

4    **VI.    KEYBANK SHOULD TURN OVER ALL RENTS PAID INTO THE LOCKBOX**

5    **POST-PETITION.**

6    Under California law, an assignment of rents is treated as a security interest, not a

7    true assignment, regardless of the language used in the assignment documents.

8    California Civil Code section 2938(a) provides:

9    (a) A written assignment of an interest in leases, rents, issues,
     or profits of real property made in connection with an obligation
10   secured by real property, irrespective of whether the
     assignment is denoted as absolute, absolute conditioned upon
11   default, additional security for an obligation, or otherwise, shall,
     upon execution and delivery by the assignor, be effective to
12   create a present security interest in existing and future leases,
     rents, issues, or profits of that real property. As used in this
13   section, "leases, rents, issues, and profits of real property"
     includes the cash proceeds thereof. "Cash proceeds" means
14   cash, checks, deposit accounts, and the like.

15   Accordingly, under California law, despite the "assignment of rents" language,

16   Keybank only has a security interest, and the Debtor maintains an ownership interest, in

17   the rents.  Thus, despite the Assignment of Rents, the rents are cash collateral subject to

18   use by the Debtor pursuant to section 363(c).  *See* March, Ahart & Tchaikovsky, CAL.

19   PRAC. GUIDE: BANKRUPTCY (The Rutter Group 2007 ("Rutter Group"), CH. 14(I)-C

20   ("Under California law, because rent assignments only create a security interest in rents,

21   the borrower/debtor continues to have an interest in rents postpetition notwithstanding any

22   prepetition enforcement actions by the secured lender (including the appointment of a

23   receiver)"); *see also In re 5028 Wisconsin Ave. Associates Ltd. Partnership,* 167 B.R.

24   699, 706 (Bankr. D. Dist. Col. 1994) (Despite an assignment of rents and prepetition

25   demand for tenants to turn over rents to the lender, "the debtor would be entitled to use

26   the cash collateral upon providing the mortgagee adequate protection. Usually, adequate

27   protection can be accorded the mortgagee by devoting the rents to necessary costs of

28

343216.1                                    11                                    MOTION

1  operating and preserving the building so as to continue generating rents." [District of

2  Columbia law]).[6]  Similarly, though the borrower may grant to the lender a lien in the funds

3  in the lockbox, those funds remain the property of the borrower until the lender actually

4  applies them to its debt.  *See 5028 Wisconsin Ave. Assoc.*, 167 B.R. at 705 (Stating that a

5  security device, such as a lockbox agreement, is "not an actual transfer of ownership to

6  the mortgagee, until the rent is actually transferred to the mortgagee for application to the

7  mortgage debt.").

8        Under § 542(a), an entity in control of property that a trustee or debtor-in-

9  possession may use under section 363 shall deliver and account for that property to the

10  trustee/debtor-in-possession. *See* 11 U.S.C. § 542(a).  Despite the Assignment of Rents

11  and the Lockbox Agreement, the Debtor retains an ownership interest in future rents and

12  those rents are therefore cash collateral under § 363(a).  Pursuant to the Lockbox

13  Agreement, KeyBank asserts a first priority lien on all funds held in the Lockbox. *See* Ex.

14  "4," at 7-8.  For this reason, KeyBank only has, at most, a security interest in the funds in

15  the Lockbox.[7]  Therefore, all rents paid post-petition by the Property's tenants, even if

16  those rents are paid into the Lockbox, are cash collateral under § 363.  Therefore,

17  pursuant to § 542(a), KeyBank is obligated to turn over all rents paid by the Property's

18  tenants after the Petition Date and future rent payments must be paid directly by the

19  tenants to the Debtor.

20  **VII.    CONCLUSION**

21        For the foregoing reasons, the Court should authorize the use of cash collateral on

22  the terms set forth above on an interim basis through the date of the final hearing and on

23  _____

24  [6] The Court may also find that KeyBank does not have a security interest on that portion of the rents
necessary to maintain the property. *See id.* ("The debtor's use may alternatively be authorized under 11

25  U.S.C. § 552(b) by limiting the mortgagee's security interest based on the equities of the case to rents net of
operating and maintenance expenses."); *In re Cardinal Indus., Inc.* 118 BR 971, 980-98 (Bankr. S.D. Ohio

26  1990); Rutter Group, CH. 14(I)-C (same).

27  [7] In fact, KeyBank may very well have no security interest in the funds at all.  The Debtor is currently
analyzing whether it has claims against KeyBank related to the withdrawal of the Lockbox funds.

28

343216.1                              12                              MOTION

1  a final basis through November 30, 2009, and order that all rents paid after the Petition

2  Date be paid directly to or shall be turned over to the Debtor.

3                                              Respectfully submitted,

4  Dated:  September 11, 2009                  WEILAND, GOLDEN,
                                               SMILEY, WANG EKVALL & STROK, LLP
5

6                                    By:  _Hutzel_____

7                                         HUTCHISON B. MELTZER
                                          Proposed Attorneys for North Valley
8                                         Mall, LLC, Debtor and Debtor-in-
                                          Possession
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DECLARATION OF DAVID KLEIN

I, David Klein, declare as follows:

1. I am a partner of Parks Diversified, the property manager of North Valley Plaza ("Property"), the real property of North Valley Mall, LLC ("Debtor"). debtors and debtors-in-possession in the above captioned case.  I am submitting this declaration in support of the Debtors' Emergency Motion for Order: (1) Authorizing Use of Cash Collateral; (2) Requiring Turnover of Post-Petition Rents ("Motion").  All terms defined in the Motion are incorporated herein by this reference.  The following is based upon my personal knowledge and if called as a witness herein, I could and would competently testify thereto.

2. I oversee and am familiar with the management of the Property and its cash flow and expenses.

3. The budget attached hereto as Exhibit "2" ("Budget") was prepared under my supervision and at my direction, and materially tracks the historical operations and cash flow of the Property.

4. In my opinion, the proposed use of cash collateral pursuant to the Budget is necessary to protect and maintain the value of the Property and to prevent a decline in value due to neglect.  Accordingly, there is cause to hear this Motion on an emergency basis, and authorize interim use of cash collateral pending a final hearing.

5. North Valley Plaza ("Property") is a shopping center located in Chico, California, with a total area of 33,550 acres, of which 243,800 square feet is leasable.  It is characterized in the commercial real estate industry as a retail "power center" because of its size and of the type and size of its tenants.  The Property's primary tenants include Trader Joe's, Dollar Tree, Michael's, a Cinemark movie theater, and, prior to December 2008, Mervyn's.

6. North Valley Mall, LLC (the "Debtor"), was formed in 2004 for the purpose of purchasing and operating the Property.  Upon completing the purchase, the Debtor

1  remodeled the Property for the purpose of increasing the gross leasable area and
2  updating the existing improvements.

3      7.    Even without a tenant in the Mervyn's space, according to a recent draft
4  appraisal conducted by CB Richard Ellis (the "Appraisal") and dated May 20, 2009, the
5  Property has a value of $28,250,000.  A copy of the Appraisal is attached as Exhibit "1."
6  The Debtor is in the process of obtaining an updated appraisal.  The Debtor is informed
7  and believes that KeyBank obtained an appraisal around the same time as the CB
8  Richard Ellis appraisal which shows an even higher value. The Debtor is currently in
9  negotiations regarding the Mervyn's space.  Any disposition of the Mervyn's space would
10  greatly increase the value of the Debtor's assets.

11      8.    To accomplish the remodel, on July 30, 2004, the Debtor obtained a
12  construction loan from KeyBank, N.A ("KeyBank") with an original principal amount of
13  $18,500,000 (the "Loan") secured by the Property and an assignment of rents (the
14  "Assignment of Rents").  On September 28, 2005, KeyBank agreed to increase the
15  principal amount of the Loan to $26,250,000.

16      9.    The original maturity date of the Loan was August 1, 2006.  Pursuant to
17  multiple extension agreements, the maturity date was extended to October 1, 2008.

18      10.    In connection with the extension agreements, the Debtor executed a lockbox
19  account agreement ("Lockbox Agreement"), whereby the Property's tenants were to pay
20  rent directly into a lockbox account ("Lockbox").  A copy of the Lockbox Agreement is
21  attached as Exhibit "4."  Under the Lockbox Agreement, KeyBank would receive payments
22  from the Lockbox in an amount to satisfy its monthly debt service under the Loan, and the
23  Debtor would receive all remaining funds in the Lockbox.  KeyBank, over time,
24  increasingly restricted the Debtor's access to the Lockbox.  Pursuant to an amendment to
25  the Lockbox Agreement dated January 2, 2008, the Debtor no longer received all funds in
26  the Lockbox exceeding KeyBank's debt service, and instead only received enough to
27  cover its monthly operating expenses.  A copy of this amendment is attached to the
28  Lockbox Agreement in Exhibit "4."  KeyBank retained the right, in its sole discretion, to

1  deny payment to the Debtor for any of its operating expenses.  Subsequently, as

2  discussed further below, KeyBank froze the Lockbox completely and did not allow any

3  funds to be released.

4      11.    Due to the current state of the real estate and credit markets, the Debtor

5  was unable to make the balloon payment due on October 1, 2008, and KeyBank issued a

6  notice of default.  KeyBank froze the Lockbox and the Debtor has not been receiving any

7  funds therefrom.  The principals of the Debtor have been paying approximately $30,000

8  per month of the Debtor's operating expenses out of their own funds for over 18 months.[8]

9      12.    After it was frozen by KeyBank, the Lockbox continued to accumulate funds.

10  By September 1, 2009, the Lockbox had an approximate balance of $900,000.  In July,

11  2009, KeyBank withdrew funds from the Lockbox to pay property taxes owed on the

12  Property.

13      13.    On June 26, 2009, the Debtor and KeyBank executed a forbearance

14  agreement (the "Forbearance Agreement"), whereby KeyBank agreed to forbear from

15  enforcing its rights with respect to the Debtor's default under the Loan.  In the

16  Forbearance Agreement, KeyBank acknowledged the outstanding amount of the Loan to

17  be $24,531,573.02.  The Forbearance Agreement expired on August 15, 2009.  After

18  multiple continuances, a foreclosure sale was scheduled for September 3, 2009.  While

19  the Debtor thought KeyBank was negotiating a restructuring agreement in good faith,

20  without notice to the Debtor, on or about August 25, 2009, KeyBank "swept" the Lockbox,

21  withdrawing all but approximately $36,000.  The Debtor is currently analyzing whether it

22  has any claims against KeyBank.

23      14.    In order to maximize value for all of the Debtor's creditors and parties in

24  interest, on September 2, 2009 (the "Petition Date"), the Debtor filed a voluntary petition

25  for relief under chapter 11.

26  _____

27  [8] The Debtors will seek approval, by a separate motion, of an administrative loan for post-petition expenses paid prior to authorization of cash collateral use.

28

15.    The Budget provides for the payment of the minimum expenditures required to operate, protect, and maintain the Property to prevent a decline in value due to neglect and to ensure that the Property continues to generate income, including payment of the property manager, Parks Diversified.  The property manager, Parks Diversified, is an affiliate of the Debtor. The Budget also provides for the payment of the administrative expenses of the estate, including professional and U.S. Trustee's fees.  The payments to professionals are in the nature of post-petition retainers which may be applied only pursuant to separate Court order regarding the fees of the professionals.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 9th day of September, 2009, at Dana Point, California.

_____
David Klein

343216.1                                    17                                    MOTION



NORTH VALLEY PLAZA
801 East Avenue
Chico, Butte County, CA  95926
CBRE File No. 09-231SF-0567

DRAFT – FOR REVIEW ONLY



## Self Contained
## Appraisal Report

**Prepared for:**

Annie Ng
Vice President
EVERTRUST BANK
1600 South Azusa Avenue, #700
City of Industry, CA  91748-1613

VALUATION & ADVISORY SERVICES

**CBRE**
CB RICHARD ELLIS



VALUATION & ADVISORY SERVICES



350 Sansome Street, Suite 840
San Francisco, CA 94104

T (415) 986-7255
F (415) 986-6862

www.cbre.com

June 3, 2009

Annie Ng
Vice President
**EVERTRUST BANK**
1600 South Azusa Avenue, #700
City of Industry, CA  91748-1613

RE:    Appraisal of North Valley Plaza
       801 East Avenue
       Chico, Butte County, CA
       CBRE File No 09-231SF-0567

Dear Ms. Ng:

At your request and authorization, CB Richard Ellis (CBRE) has prepared an appraisal of the market value of the referenced property.  Our analysis is presented in the following Self Contained Appraisal Report.

The subject is a 243,800 square foot retail power center located at the southwest corner of East Avenue and Cohasset Road in Chico, CA 95926.  It was built in various phases since 1968 and the most recent addition occurred in 2005.  Major tenants include Cinemark (theatre), Michael's, Trader Joe's, and Dollar Tree.  An additional anchor tenant space with 84,414 square feet was formerly occupied by a Mervyn's department store.  Mervyn's vacated the center at year end 2008. Additionally, there are three freestanding pad buildings (Taco Bell, Panda Express, and Wendy's) that are situated on ground leased parcels.  The Taco Bell, Panda Express and Wendy's building improvements are separately owned by the lessees and are not a part of the subject of this report.  As of the date of inspection, the facility was 59.5% occupied and considered to be in average condition. The majority of the current vacant space consists of the vacant department store anchor (84,414 square feet out of a total of 98,806 square feet of unoccupied space.  The center is situated on a 33.550-acre site.  Of this, the subject also includes approximately 5.34 acres of surplus land that is allocated for separate parcels and future development.

The improvements were originally constructed as an enclosed mall and in 2001 the mall was reconfigured, renovated, and converted to the open-air shopping center that now exists.

The subject is more fully described, legally and physically, within the enclosed report.

© 2009 CB Richard Ellis, Inc.

Exhibit 1    Page 19

Annie Ng
June 3, 2009
Page 2

Based on the analysis contained in the following report, the market value of the subject is concluded as follows:

| MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is | Leased Fee Interest | May 20, 2009 | $28,250,000 |
| Hypothetical as if Stabilized | Leased Fee Interest | May 20, 2009 | $29,870,000 |
| Compiled by CBRE | | | |

The following extraordinary assumption and limiting condition applies.

- The market value estimate at stabilization is based on the hypothetical condition that the property is leased to a stabilized occupancy level as of the date of value.

Data, information, and calculations leading to the value conclusion are incorporated in the report following this letter. The report, in its entirety, including all assumptions and limiting conditions, is an integral part of, and inseparable from, this letter.

Substantial volatility in the capital markets has increased uncertainty in the real property marketplace. It is difficult to predict what may happen in the capital markets going forward. As a result, it is difficult to predict what may happen to real property values over time. Our valuation of the subject property considered the best information that was available at the time of our analysis. Due to on-going volatility in the marketplace, users of this appraisal should consider the current market uncertainty when determining the level of confidence they choose to place on these analyses and conclusions. Users are reminded that the appraisal conclusions in this report are effective as of the stated date(s) of valuation.

The following appraisal sets forth the most pertinent data gathered, the techniques employed, and the reasoning leading to the opinion of value. The analyses, opinions and conclusions were developed based on, and this report has been prepared in conformance with, our interpretation of the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute, the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Title XI Regulations, and EverTrust Bank's standards.

The report is for the sole use of the client; however, client may provide only complete, final copies of the appraisal report in its entirety (but not component parts) to third parties who shall review such reports in connection with loan underwriting or securitization efforts. Appraiser is not required to explain or testify as to appraisal results other than to respond to the client for routine and customary questions. Please note that our consent to allow an appraisal report prepared by CBRE or portions of such report, to become part of or be referenced in any public offering, the granting of such consent will be at our sole discretion and, if given, will be on condition that we will be provided with an Indemnification Agreement and/or Non-Reliance letter, in a form and content satisfactory to us, by a party satisfactory to us. We do consent to your submission of the reports to rating agencies, loan participants or your auditors in its entirety (but not component parts) without the need to provide us with an Indemnification Agreement and/or Non-Reliance letter.



© 2009 CB Richard Ellis, Inc.

Exhibit 1    Page ___

Annie Ng
June 3, 2009
Page 3

CBRE hereby expressly granted to Client the right to copy this report and distribute it to other parties in the transaction for which this report has been prepared, including employees of Client, other lenders in the transaction, and the borrower, if any. It has been a pleasure to assist you in this assignment. If you have any questions concerning the analysis, or if CBRE can be of further service, please contact us.

Respectfully submitted,

CBRE - VALUATION & ADVISORY SERVICES

DRAFT – FOR REVIEW ONLY                          DRAFT – FOR REVIEW ONLY
Andrew Burger                                    David J. Blesch
Appraiser                                        Senior Appraiser
California Trainee License No. AT042112          California Certification No. AG036015

Phone:    (415) 986-7942                         Phone:    (415) 986-7253
Fax:      (415) 986-6862                         Fax:      (415) 986-6862
Email:    andrew.burger@cbre.com                 Email:    david.blesch@cbre.com


DRAFT – FOR REVIEW ONLY
Elizabeth Champagne, MAI, MRICS
Senior Managing Director
California Certification AG025144

Phone:    (415) 986-7395
Fax:      (415) 986-6862
Email:    elizabeth.champagne@cbre.com

**CBRE**
CB RICHARD ELLIS

© 2009 CB Richard Ellis, Inc.

Exhibit 1    Page 21

NORTH VALLEY PLAZA                                                    CERTIFICATION OF THE APPRAISAL

## CERTIFICATION OF THE APPRAISAL

We certify to the best of our knowledge and belief:

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are our personal, impartial and unbiased professional analyses, opinions, and conclusions.

3.  We have no present or prospective interest in or bias with respect to the property that is the subject of this report and have no personal interest in or bias with respect to the parties involved with this assignment.

4.  Our engagement in this assignment was not contingent upon developing or reporting predetermined results.

5.  Our compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

6.  This appraisal assignment was not based upon a requested minimum valuation, a specific valuation, or the approval of a loan.

7.  Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal, as well as the requirements of the State of CA.

8.  Our analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice of The Appraisal Foundation and the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

9.  The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

10. As of the date of this report, Elizabeth Champagne, MAI, MRICS has completed the continuing education program of the Appraisal Institute.

11. Andrew Burger and David Blesch have, and Elizabeth Champagne, MAI, MRICS has not made a personal inspection of the property that is the subject of this report.

12. Andrew Burger, David Blesch, and Elizabeth Champagne, MAI, MRICS have extensive experience in the appraisal/review of similar property types and are competent to appraise the subject property.

13. No one provided significant real property appraisal assistance to the persons signing this report.

14. Valuation & Advisory Services operates as an independent economic entity within CBRE. Although employees of other CBRE divisions may be contacted as a part of our routine market research investigations, absolute client confidentiality and privacy are maintained at all times with regard to this assignment without conflict of interest.

DRAFT – FOR REVIEW ONLY                          DRAFT – FOR REVIEW ONLY
Andrew Burger                                    David J. Blesch
California Trainee License AT042112              California Certification AG036015

DRAFT – FOR REVIEW ONLY
Elizabeth Champagne, MAI, MRICS
California Certification AG025144

i



© 2009 CB Richard Ellis, Inc.



NORTH VALLEY PLAZA

SUBJECT PHOTOGRAPHS

## SUBJECT PHOTOGRAPHS



AERIAL VIEW

ii

© 2009 CB Richard Ellis, Inc.

Exhibit 1    Page 23

NORTH VALLEY PLAZA                                    SUBJECT PHOTOGRAPHS



**TYPICAL VIEW OF THE SUBJECT**



**TYPICAL VIEW OF THE SUBJECT**

iii

*© 2009 CB Richard Ellis, Inc.*

Exhibit 1    Page 24

NORTH VALLEY PLAZA                                          SUBJECT PHOTOGRAPHS



TYPICAL VIEW OF THE SUBJECT



TYPICAL VIEW OF THE SUBJECT - THEATRE

iv

© 2009 CB Richard Ellis, Inc.

Exhibit 1    Page _25_

NORTH VALLEY PLAZA                                    SUBJECT PHOTOGRAPHS



TYPICAL VIEW OF THE VACANT MERVYN'S



TYPICAL VIEW OF THE SUBJECT –BANK OF AMERICA PAD

© 2009 CB Richard Ellis, Inc.

Exhibit 1    Page 20

NORTH VALLEY PLAZA                                    SUBJECT PHOTOGRAPHS



VIEW OF THE PARKING AREA



VIEW OF A VACANT RETAIL SPACE INTERIOR

vi

© 2009 CB Richard Ellis, Inc.

Exhibit 1    Page 21

NORTH VALLEY PLAZA                                          SUBJECT PHOTOGRAPHS



VIEW OF THE JOHNSON FAMILY SHOES INTERIOR



VIEW OF THE DOLLAR TREE INTERIOR

vii

© 2009 CB Richard Ellis, Inc.

Exhibit 1    Page __28__

NORTH VALLEY PLAZA                                    SUBJECT PHOTOGRAPHS



VIEW OF EAST AVENUE – LOOKING WEST



VIEW OF EAST AVENUE – LOOKING EAST

viii

© 2009 CB Richard Ellis, Inc.

Exhibit 1    Page 29

NORTH VALLEY PLAZA                                    SUBJECT PHOTOGRAPHS



VIEW OF PILLSBURY DRIVE – LOOKING WEST



VIEW OF PILLSBURY DRIVE – LOOKING EAST

ix

© 2009 CB Richard Ellis, Inc.

Exhibit 1    Page 30

NORTH VALLEY PLAZA                                                    SUBJECT PHOTOGRAPHS



**VIEW OF COHASSET ROAD – LOOKING NORTH**



**VIEW OF COHASSET ROAD – LOOKING SOUTH**

x

© 2009 CB Richard Ellis, Inc.

Exhibit 1    Page 31

NORTH VALLEY PLAZA | SUMMARY OF SALIENT FACTS

## SUMMARY OF SALIENT FACTS

| Property Name | North Valley Plaza | |
|---|---|---|
| Location | 801 East Avenue, Chico, Butte County, CA 95926 | |
| | | |
| Census Tract / Block | 2.02 / 1 | |
| Assessor's Parcel Number | 007-280-048 | |
| | 007-280-060 | |
| | 007-280-061 | |
| | 007-280-062 | |
| | 007-280-063 | |
| **Highest and Best Use** | | |
| As Vacant | Hold for retail development | |
| As Improved | Continued retail power center use | |
| **Property Rights Appraised** | Leased Fee Interest | |
| **Total Land Area - Incl. Excess Land** | 33.55 AC | 1,461,438 SF |
| **Excess Land Area** | 5.34 AC | 232,610 SF |
| **Flood Panel** | Zone X - Panel 0600170340C | 6/8/1998 |
| **Improvements** | | |
| Property Type | Retail | (Power Center) |
| Number of Buildings | 7 | |
| Number of Stories | 1 and 2 | |
| Gross Leasable Area | 243,800 SF | |
| Year Built | 1968/1994/2002/2004/2005 | Renovated: 2005 |
| Effective Age | 15 Years | |
| Condition | Average | |
| **Estimated Exposure Time** | 12 Months | |
| **Financial Indicators** | | |
| Current Occupancy | 59.5% | |
| Stabilized Occupancy | 91.0% | |
| Stabilized Credit Loss | 1.0% | |
| Overall Capitalization Rate | 8.75% | |
| Discount Rate | 10.00% | |
| Terminal Capitalization Rate | 9.25% | |

| **Pro Forma Operating Data** | *Total* | *Per SF* |
|---|---|---|
| Effective Gross Income | $3,337,813 | $13.69 |
| Operating Expenses | $1,063,863 | $4.36 |
| Expense Ratio | 31.87% | |
| Net Operating Income | $2,273,951 | $9.33 |

xi

© 2009 CB Richard Ellis, Inc.

Exhibit 1   Page 32