

**FILED & ENTERED**

JUN 21 2010

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY ngo       DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>NORTH VALLEY MALL, LLC, a California limited liability company,<br><br><br><br><br><br>Debtor(s). | Case No: 8:09-bk-19346-TA<br><br>Chapter: 11<br><br>CORRECTED AMENDED MEMORANDUM OF DECISION ON CONFIRMATION OF DEBTOR'S SECOND AMENDED PLAN<br><br>Date: May 6, 2010<br>Time: 1:30 p.m.<br>Location: 5B |

Confirmation of the Debtor's Second Amended Chapter 11 Plan of Reorganization ("plan") came on for hearing May 6, 2010. The Court heard testimony from the parties' expert witnesses, received documents and declarations into evidence, considered the arguments of the parties and took the matter under submission. The Court has also since received and considered the closing briefs and replies of both the debtor and of the only party objecting to confirmation, Key Bank National Association ("the bank"). The Court now renders its Memorandum of Decision on Confirmation.

Primarily the Court is required to decide two closely interrelated questions, i.e.: (1) is the plan "fair and equitable" because it complies with 11 U.S.C. §1129(b)(2)(A)(i)[1] in that the promised monthly payments over the seven year term of the plan, inclusive of interest, when reduced to present value, yields a sum that is not less than the secured claim of the bank; and (2) is the plan "feasible," or in words of the statute, not likely to be followed by liquidation or further need for reorganization, as is required under §1129(a)(11)? All of the other provisions of §1129(a), with the exception of subsection (a)(7) [all impaired classes consent], are proven to the satisfaction of the Court. No other provisions save these two are contested by the bank.

**1. Facts**

The facts are largely undisputed. The debtor owns real property at 801 East Avenue in Chico, California known as "North Valley Plaza" ("the property"). The property is a 243,800 square foot "power center" with 29 retail suites. There are a number of existing tenants including Michaels, Cinemark Theater, Trader Joe's, Ben & Jerry's and Dollar Tree. Taco Bell, Panda Express and Wendy's are adjoining businesses not part of the property. Financial troubles for the property began in December of 2008 when its anchor tenant, Mervyn's, filed its bankruptcy petition and vacated its 84,414 sq. ft. space. This anchor space is still not under long-term lease although reportedly debtor has attempted to augment revenue with short term tenants in this location and is actively searching for a replacement long-term tenant. As of July 2009, the property was only about 59.5% leased. The property also contains about 5.34 acres of land allocated for parcels and future development.

The obligation to the bank began as a construction loan in the maximum amount of $26,250,000 secured by a first deed of trust recorded on or about March, 2005 against the property. According to the bank, the current balance owed on its loan is $25,373,640.34.

---

[1] All statutory citations are to 11 U.S.C., unless otherwise designated.

There may be disputes about some post-petition default interest, fees and charges. There is relatively little dispute as to the value of the property. The two appraisers are very close in their respective opinions of value and the parties offered a stipulation[2] (presumably based upon the appraisals) that the property has an "as is" value[3] of not less than $27,800,000 and not more than $28,250,000, and a "stabilized value" of not less than $29,870,000 and not more than $32,500,000. Because this is an art and not a science, and given that the respective parties are so relatively close in valuation, the Court for purposes of this opinion will assume an "as is" value of $28,000,000 and a stabilized value of $31,000,000. Although both appraisers have assumed that the vacant anchor space will be leased and other vacancies filled, and thus be "stabilized" within 18 months, the Court notes that the appraisals are now about one year old and no such leasing has happened yet.

### 2. "Or such other rate as the Court determines…"

At the threshold the Court must deal with two subsidiary issues. First, there is the bank's objection that the plan cannot be confirmed because the plan provides for an interest rate of "6% fixed, *or such other rate of interest as is necessary to comply with 11 U.S.C. §1129(b)(2)(A)(i)(ii)*…" (Italics added) The bank argues that such an elastic provision is not consistent with law because it interferes with a party's decision on which way to cast its vote, and/or because it creates a disincentive for the debtor to put forward its best rate because it can rely upon the court to "fix" its plan, thus necessitating extra time and expense, and/or because it warps the adversary process because it sets up the court as "an independent fact finder dictating a solution to the parties." Conspicuously absent in the bank's argument is any citation to authority. Moreover, the argument is not internally consistent; how can it be a net saving of time and expense if the court is left with only an "up or down" option? Forcing the

---

[2] Transcript of Hearing ("Tr") 21-22.
[3] This lesser value is for the property without an anchor tenant. The "stabilized" value assumes a more normal compliment of tenants, including a long-term anchor tenant.

proponent to file a whole new plan and disclosure statement simply to fix an interest rate issue, even if only off by a few basis points, in the Court's view would wastefully consume even more time and expense.  The Court has no doubt that debtor would have agreed to a higher rate given that its own experts acknowledge that 6% is too low; the real problem is that there is still a gap between what the bank thinks is minimally necessary and the debtor's maximum ability to pay such a rate. Moreover, from day one it has been obvious that the cramdown rate of interest would be the primary issue in this case, so the bank cannot argue that it has been mislead or that, in the end, the Court would have to make hard decisions. Further, debtor cites cases where just such an approach has been embraced by bankruptcy courts as a practical solution to this dilemma. *See, e.g., In re Good*, 413 B.R. 552, 558 (Bankr. E.D.Tex. 2009); *In re Coram Healthcare Corp.*, 315 B.R. 321, 351 (Bankr. D. Del. 2004). Since there is no statutory obstacle, and the bank cites no cases either, the Court is persuaded that there is nothing fundamentally wrong with a plan that provides such an elastic provision concerning a proposed cramdown interest rate.

### 3. Does §1129(b)(2)(A)(i) apply?

Similarly, the bank argues that §1129(b)(2)(A)(i) cannot apply because, as originally written, debtor proposed in the plan that future sales of the undeveloped pads on the property be free of liens, with portions of the proceeds remitted to the bank a function of a release price formula somewhat vaguely described at page 5 of the plan.  The bank correctly argues that such a provision would be, absent an ability to credit bid, inconsistent with the requirement found at §1129(b)(2)(A)(i)(I), i.e. that until paid in full the bank must retain its lien. Remembering perhaps that "discretion is the better part of valor,"[4] the debtor has at page 23 of its Closing Brief proposed a "non-material" amendment providing that *all* sale or refinance proceeds will be paid to the bank. The Court agrees that this amendment is sufficiently non-

---

[4] With apologies to William Shakespeare's Falstaff in *Henry the Fourth, Part 1 Act 5, scene 4, 115-121*

material from the standpoint of all other classes such that it could be adopted in this manner without re-soliciting ballots.[5]

### 4. Is the plan "fair and equitable"?

If not all impaired classes consent, the proponent may still confirm a plan under §1129(b) if, as to the non-consenting class, the plan is "fair and equitable." "Fair and equitable" in cramdown as against a class of secured claims can be any of three kinds as described at §1129(b)(2)(A). The channel pertinent here is found at subsection (A)(i), which in turn has two subparts, i.e.: (I) that the secured class retains its lien [which has now been resolved as provided above] and (II) "That the holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property…" Restated in basic terms, "present value" is the mirror image of "interest rate," and the plan cannot impose uncompensated risk upon the bank by paying too low an interest rate under the plan. Of course, determining a sufficient rate of interest in any individual case depends on quantifying risk, which in turn depends on issues such as collateral value, credit history, term of the loan and the market rates of interest generally. A fixed rate such as proposed here creates its own quantum of risk because, as the parties recognize in their briefs, a fixed rate of interest creates the possibility that, aside from risk of default, the market generally may move to a more inflationary environment where the crammed-down creditor may be left illiquid and thus without the ability to reinvest its capital at currently prevailing rates. All risks must be identified and compensated to a reasonable degree; what the law seeks is that elusive equilibrium between the value of the funds invested

---

[5] This is not true, however, with respect to any attempt to withdraw the Lucia Parks guaranty. The bank in its post trial reply brief, p. 6, infers an attempt to modify the plan respecting the guaranty depending on what the Court might rule on interest rate issues. The Court is not called upon to rule on this specific issue at this time, but it would seem to be not only a material change to the plan but possibly an impermissible non-debtor discharge as well.

in the plan through interest vs. the value to the creditor of being able to retrieve its capital for reinvestment elsewhere, or stated differently, the non-consenting creditor must receive a value under the plan not less than the value of its right to immediately foreclose upon its collateral.

In both the literature and in many of the cases there is much unfortunate discussion of "market rates." Markets by definition imply a willing buyer and a willing seller. But by definition cramdown implies an *un*willing seller who is compelled by the court to make a loan to the debtor under the plan; also implied is debtor's inability to refinance elsewhere (else that would be the plan approach). But not every Chapter 11 plan involving a non-consenting secured creditor is doomed to failure just because the debtor cannot refinance. So, more appropriately, markets such as they exist are but one reference point among many in an attempt to find a suitable proxy where no real market exists. That is why most of the case law in this area involves some kind of "formula" approach as discussed by the U.S. Supreme Court in *Till v. SCS Credit Corp.*, 541 U.S. 465, 479-80, 124 S. Ct. 1951, 1961 (2004). In *Till,* the court searched for a "proxy" in lieu of a market by starting with a risk-free or nearly risk free rate, such as U.S. Treasuries or the prime rate, and then built up a rate by adding basis points to account for the unique issues of risk present in the subject transaction. *Till* endorsed the formula approach but did not specifically decide the appropriate "scale for the risk adjustment" beyond noting that some courts had adopted a 1-3% over prime adjustment.  *Id.* at 480. *Till* held that the court is to attempt to fashion a rate that compensates for the risks both of the cost of money and of the risk of default, by noting such issues as nature of the security and duration and feasibility of the plan. *Id.* at 479. The *Till* court did acknowledge that adopting too high a rate might render a plan infeasible, but noted that the remedy in such a case was to simply deny confirmation on the grounds of feasibility. *Id.* at 480-81.   This does not suggest to the Court that *Till* stands for the proposition that the debtor gets away with an unreasonable discount if the indicated cramdown rate is more than 3 over prime (6.25% currently), or that dissenting creditors can be made to shoulder uncompensated risk; rather, this is merely an

acknowledgement that the issues of feasibility and of cramdown interest rates are closely intertwined. Although it is unclear to what extent *Till* governs in Chapter 11s,[6] the Court agrees that it is necessary to adopt some kind of a formula approach in order to approximate as nearly as is possible compensation for the risks that are proposed to be imposed upon the bank. Whatever implication could be drawn from the *Till* discussion of a possible 1-3% over the prime rate is tenuous at best in this case. There is a world of difference between the collateral in *Till* (a truck) in a Chapter 13 case and the collateral in the case at bench.  A used truck has a readily ascertainable range of values, depending on model year and condition; there are publications of the values which are universally available to the buying and selling communities. Prime rate is usually quoted in the personal property, commercial context, not in real estate loans. The collateral in our case, in contrast, is a shopping center, a much longer-term asset; it is valued very differently, primarily by discounting projected future cash flows and it has a much more restricted and sophisticated body of buyers and lenders.  But still a formula approach is appropriate to "build up" a rate that can be said to approximately compensate for the level of risk proposed under the plan. *See* Reehl and Milner, *Chapter 11 Real Estate Cram-Down Plans: The Legacy of Till*, 30 Cal. Bankr. J. 401 (2010) and Reehl and Milner, *Cram-Down Interest Rates: The Quest Continues*, 30 Cal. Bankr. J. 15, 22 (2009).

Although there are many "formula" cases,[7] the Court believes the approach that is best utilized in a commercial real estate case like ours is the "blended rate" approach in *Pacific First Bank v. Boulders on the River, Inc. (In re Boulders on the River, Inc.)*, 164 B.R. 99, 105 (9th Cir B.A.P. 1994). In *Boulders* the court used a blended rate comprised of two tranches, a first

---

[6] At its footnote 14, the *Till* court notes that in Chapter 11, in contrast to Chapter 13, there might exist a true market by reference to various lenders specializing in DIP loans. But the kinds of loans referenced are usually ones bankable early in the case using some traditional criteria concerning collateral value and demonstrated payment ability, not so much on the kind of issues confronting us in this cramdown.  In the context at bench, we are asked to make sense of present value and interest rate concepts at the extreme, well beyond what any sensible lender would do on a consensual basis.

[7] See e.g. *Till, 541 U.S. at 479*; *In re Fowler*, 903 F. 2d 694, 697 (9th Cir. 1990); *In re El Camino Real*, 818 F. 2d 1503, 1508 (9th Cir. 1987).

level comprised of what could be roughly called "market rate" loans made on then standard terms at 8.25% up to 70% of the $15,020,000 collateral value, and then a mezzanine tranche comprised of 12% on the additional balance of the loan which exceeded 70% of the collateral value. The *Boulders* opinion is silent as to where this second rate came from but one presumes testimony was given regarding rates then prevailing from mezzanine lenders. Since the subject loan balance of $13,300,000 was 88% of value, the first tranche at 70% of value was $10,514,000 and the second mezzanine tranche was comprised of only the remaining $2,786,000 of the loan. The "blended rate" was then calculated at 9.035%, i.e. $10,514,000 @ 8.25% = $867,405; $2,786,000 @ 12%=$334,320; $867,405+334,320= $1,201,725; $1,201,725÷13,300,000= .0903553 or 9.035%. *Boulders*, 164 B.R. at 106, n. 5

Although *Boulders* involved only two tranches, and was decided in a different business era with different prevailing rates and percentages of loan to value, there is no conceptual obstacle to further blending the rate comprised not only of standard and mezzanine rates, but perhaps of a third equity return rate as well, as necessary, where it becomes unrealistic to believe that any lender will loan up to a very high percentage or even 100% of value.  See Reehl and Milner, *Cram Down Interest Rates: The Quest Continues*, 30 Cal. Bankr. J. at 22, 26, citing *Boulders, In re Villa Diablo Assoc.*, 156 B.R. 650 (Bankr. N.D. Cal. 1993) and *In re Landmark at Plaza Park Ltd.*, 7 B.R. 653 (Bankr. N.J. 1980). Both the debtor and the bank in their briefs accept the blended rate approach in concept.  The parties differ primarily in their percentage allocation between a "market rate" initial tranche, inclusion of a second "mezzanine" rate and the proportion at an equity rate, and upon where those lines should be drawn and/or the rates assigned to each tranche.  Of course, whether a "market" rate is given for the initial 65% or only up to 50%, whether three tranches are used or only two, and the respective rates adopted for each element and valuations of collateral, will affect profoundly the resulting "blended" rate.[8]  In the end, everything depends on the evidence available to

---

[8] How the resulting blended rates may differ depending on the assumptions used is demonstrated by comparing footnotes 5 and 6 in *Boulders*, 164 B.R. 106 where the only assumption differing was the value of the

support the respective expert's assumptions based on current data and upon the soundness of the experts' methods.

David Hahn, one of the debtor's experts,[9] testified that he broke the bank's loan down into three tranches: a first tranche at 65% to which he assigned an average rate of 6.25% fixed, based upon a survey he conducted of ten lenders active in financing similar real estate deals including life insurance companies and banks. He testified that lenders in this category quoted terms including 6-7% interest per annum fixed, 60-70% loan to value ratio "with a concentration from 6.25% to 6.5% for centers with stabilized vacancy rates," a 20-30 year amortization rate with a five to ten year balloon; these terms are not dissimilar to the plans' thirty year amortization rate with a seven year balloon. Hahn Declaration ¶¶22-25. Mr. Hahn then applied this 6.25% tranche to 65% of a $30 million collateral value, which value was apparently an arbitrary near-average of the two appraisers' "stabilized" values. Hahn Declaration ¶ 21.  This 65% yields an initial tranche of $19.5 million. This corresponds to the "market rate" senior tranche in *Boulders*.

The bank's expert, Andrew Manley, in coming up with his senior tranche, adopts much more conservative assumptions. First, he ascribes an initial tranche to only 50% of value, and then applies this to only the "as is" (not the stabilized) value[10] of either $27,800,000 ($13,900,000) or $28,250,000 ($14,125,000). Manley Declaration ¶23-25.  Mr. Manley comes up with a senior tranche rate of 7.5%.[11] Although mention is made of "my surveys of market

---

collateral.

[9] The Court was interested by, but not persuaded by, the very able testimony of Mr. J. Michael Issa.  While a few workout arrangements from a variety of troubled loans of only passing similarity to this one might have *some* bearing on the interest rate calculation, the resulting average stated in his declaration is based on too small a sampling and is influenced by far too many extraneous, *ad hoc* and hard-to-quantify influences beyond that of just lending rates.

[10] In contrast, Mr. Manley opines that on "stabilized" properties the initial loan tranche might extend up to 65% of value, which is closer to the Hahn opinion. [Tr. 72:16-23]

[11] Interestingly, on stabilized properties Mr. Manley's rate is 100 basis points less or 6.5%, not that different from Mr. Hahn's 6.25%. [Tr.Vol. 2, 73:1-7]

- 9 -

participants" no direct testimony is given as to who were these "market participants" or how many were canvassed, but it appears that very few were actually market participants [Tr. Vol. 2, 62:24- 64:8]. It appears that much weight instead was given to Mr. Manley's own assumptions based on his admittedly long experience in the real estate investment field and on interviews with people he already knew. [Tr. Vol. 2 61: 15-17; 61: 18-25; 62:11-16; 69: 1-6; 84: 3-22]  In sum, the Court is more persuaded by the Hahn testimony and the Court finds that a senior tranche at 6.25% equal to the first 65% of the bank's loan, is the more sound approach than is the hyper-conservative approach used by Mr. Manley. As noted in footnote 11, when adjusted for the stabilized vs. "as is" valuations, Mr. Manley's rate becomes 6.5%, relatively close to Mr. Hahn's.

But upon what value should this 65% tranche be calculated?  Mr. Manley applies this only to "as is" values as he testifies this is what lenders in today's market actually evaluate, and (by implication) nothing else. Manley Declaration ¶21.  Mr. Hahn in contrast goes to an average of the "stabilized values" and compensates for the extra risk[12] by referring to the guaranty from Lucia Parks; he considers the two issues to be about a wash. Hahn Declaration ¶¶ 24, 36.  It seems to the Court that again Mr. Manley is being very conservative, but on balance he may be more correct. In reality, the vacancy left by Mervyn's will not last forever, as even the bank's appraiser recognizes.  Whether the vacancy will last 18 months, two years or even longer, is, of course, difficult to quantify. But *some* recognition should be given to this potential value and permanently evaluating the 7-yr. loan on the lesser value prevailing only at the beginning portion of term based upon what should be a temporary condition, skews the result toward the conservative. This may be in part attributable to the fact that Mr. Manley primarily spoke to lenders who were only willing to loan on terms of about two years. Supp. Manley Decl. ¶8. In such cases, of course, the lack of an existing anchor tenant is magnified in

---

[12] The risk spoken of here is that the property will be absent an anchor tenant for a protracted period beyond the 18 months estimated in the appraisals.

importance. On the other hand, the Court does not agree with Mr. Hahn's approach of merely assuming a stabilized value as this involves a rather large dose of speculation. If the Court adopts its own average of the "as is" values, this would mean an "as is" collateral value of $28,000,000 or an initial tranche of $18,200,000 @ 6.25%. Rather than merely equating the difference between the "as is" value and the stabilized value by referring to the guaranty, a "short cut" proposition for which there is little or no evidence or analysis,[13] the Court chooses instead to regard the presence of the guaranty as an additional, intangible and unquantified factor which in many areas justifies leaning away from the more conservative assumptions of Mr. Manley toward a more middle of the road analysis.

The experts disagree also on whether there should be three tranches, to include a mezzanine debt tranche, or only two. Again Mr. Manley adopts the very conservative approach of assuming that everything junior to the senior debt tranche should be regarded at high equity rates. He does so mostly because reportedly there is little or no mezzanine financing available in today's market. Mr. Manley in his Supplemental Declaration cites to "Emerging Trends in Real Estate 2010" from the Urban Land Institute, a PriceWaterhouse Coopers publication at its page 22. There the Urban Land Institute authors opine that mezzanine debt is not available at any price in this market.[14] From this proposition Mr. Manley feels justified in regarding everything over the senior tranche at equity rates which he estimates at 20% per annum. But the Court agrees with the debtor that this again distorts the picture toward the conservative. As stated above, the blended rate approach suggested in cases like *Boulders* and in the Reehl and Milner articles is not an attempt to mirror an *actual* market that exists. Rather, it is an attempt by principled approach to create a proxy for a market extrapolated from current data

---

[13] Little or no **evidence** was presented on critical issues such as collectability of the guaranty and/or the amount of other debt which may have recourse to Ms. Parks' assets. Moreover, Mr. Manley opined that lenders on the senior tranche are likely all to require recourse. [Tr.Vol 2, 64:19-25]

[14] Interestingly, even here there is equivocation. The actual cite provides: "In the new world order, mezz will reincarnate as a mid-tier product, at 400-500 basis point spreads over equity 'like it used to be.'" Moreover, even Mr. Manley concedes that mezzanine financing will return at some point. [Tr.Vol.2, 76:20-24]

such that the court can reach the ultimate question of "present value." The problem with Mr. Manley's approach is that it evaluates the first ten percent of loan value junior to the initial debt tranche as if it had the same inherent risk as the last ten percent, a very dubious assumption. That a property might decline in value by, say 10% is a real and profound risk to any position dependent on that most junior position in the property, such as equity; but this decline might not be so severe to the interests represented by the first 10% or 20% of debt junior to the 65% senior tranche which could, in this example, still emerge unscathed.  So it is safe to say there is a different quantum of risk associated with each position, this should be reflected somehow in the appropriate analysis and would result in different interest rates included in the blend which would more accurately reflect the overall risk.

Mr. Hahn, in contrast, admits that there is no active mezzanine market currently available but he does not stop there. True to the blended rate approach he extrapolates from other data including reference to the Korpacz Real Estate Investor Survey. From this he concludes that the average investment yield on unleveraged shopping centers similar to the property was 10.8% nationally for the 4th quarter of 2009. From this data he calculates a proxy for the mezzanine layer of debt by subtracting a cost of 6.25% for the first 65% of property value to derive a 17.18% yield on the remaining 35% of value. Hahn Declaration ¶¶26-27. But recognizing as discussed above that even this approach does not adequately differentiate between the last position in the collateral value and the least junior just behind the senior tranche, which positions face markedly different degrees of risk, he breaks this 35% tranche into two parts. He weights the intermediate mezzanine layer at 11.18% for a tranche between 65% and 85% of value and the last "equity" layer at 25.18%[15] attributable to the last 15% of value. He then blends these on a weighted basis to equate to the derived 17.18% Korpacz average which assumed an initial tranche of debt for 65% at 6.25%.  Hahn Declaration ¶¶ 28-

---

[15] This equity rate is higher than the 20% equity rate chosen by Mr. Manley, but the two numbers may not be fundamentally different if adjusted for what is respectively represented. Mr. Manley's number equates to a broader swath of "equity" involving less leveraged deals while Mr. Hahn's "equity" tranche looks only at the narrow band of highly leveraged deals.

- 12 -

30. Clearly there is a large measure of arbitrariness in this line-drawing <u>but</u> the Court is persuaded that Mr. Hahn's approach is a sound one in that, unlike Mr. Manley's, it makes some reasonable attempt to recognize that the level of risk changes depending upon whether a lender is at the 66% mark on the collateral, or the 99% mark. Just because the marketplace right now does not quote on mezzanine debt does not change this reality nor should it, in the Court's view, constrain the parties from interpolating data in a principled way to recognize this difference.[16] As stated above, the formula or blended rate approach is not merely a mirror of market conditions; rather, it is a principled derivation from current data of a proxy rate where no market currently exists.

In sum, the Court believes the Hahn approach to be the more correct overall, although a few corrections should be made such as to the "as is" value used and to the actual balance owed the bank. Corrected for these issues, the calculation using Mr. Hahn's approach would be:

1. **senior tranche**: .65 X $28,000,000 = $18,200,000 @ 6.25%= $1,137,500

2. **mezzanine tranche:** .20 X $28,000,000 = $5,600,000 X 11.18%=$626,080

3. **equity tranche:** $1,573,640 X 25.18%= $396,242.55

4. **blended rate**: $1,137,500+$626,080+396,242.55 = $2,159,822.55÷$25,373,640= **8.512 % rounded to 8.5%**[17]

---

[16] Upon the Court's questioning even Mr. Manley admitted that given the right circumstance and the right borrower, obviously a mezzanine loan could be arranged at some price, although he thought the rates would be higher, say 15%.[Tr.Vol. 2, 77:13-25; 78]

[17] The Court feels comfortable in rounding down since only the most pessimistic would argue that the "as is" value will last forever. If the calculation were readjusted at $31,000,000 for a stabilized value, the calculation looks like this: **senior tranche** .65X $31,000,000= $20,150,000@ 6.25%=$1,259,375; **mezzanine tranche** $25,373,640-20,150,000=$5,223,640@11.18%=$584,002.96; **blended rate=** $1,259,375+584,002.96 = **$1,843,377.96÷$25,373,640= 7.265%.** If one were to arbitrarily assume that half of the seven year term were at the lower rate because the property were leased up, an average of the two derived rates would be 8.512% + 7.265%÷2= **7.8885%.** While the Court is not prepared to find that this arbitrary averaging is appropriate, because the property is still not stabilized and we cannot be sure when it will be, it is fair to comment that there is considerable reason to believe that the rate can be viewed as conservative if applied for the entire term of the

We are left with the issue of loan covenants, which the bank complains affects the degree of risk if left out from the reorganized debtor's set of obligations. While this proposition is certainly true logically, little or no evidence is presented from which the Court might *quantify* that degree of risk. The Court notes from page 24 of the debtor's Reply to Key Bank's Post Trial Brief that there remain an array of covenants protecting the bank, and the Court is given no basis for concluding that the absence of a few here or there, or modification of some existing covenants, will magnify the risk to the bank in any appreciable way, nor can their absence be translated into some few basis points of interest here or there to equate for this vague level of risk. While the Court believes the blended interest rate formula approach to cramdown is a sound one, we should not delude ourselves into thinking that it is a precise science.

For the reasons stated, the Court finds that an interest rate of 8.5% per annum, fixed for seven years, will provide the "present value" of the bank's secured claim within the meaning of §1129(b)(2)(A)(II).

### 5. Is the plan feasible?

The remaining issue before the Court is whether the plan is likely to be followed by liquidation or further need of financial reorganization, as described at §1129(a)(11). In common parlance, is the plan feasible? The debtor argues that even at a rate of 8.25% the plan is still feasible in that on its projections there is only a temporary shortfall of $23,000, and this could be met either by delaying payment of this sum to the bank temporarily (in effect temporarily negatively amortizing) or by the principals advancing this sum. *See* Debtor's Closing Brief, pp. 25-26 n. 7 and 8, *citing* Exhibit "A" @ p. 33. The Court notes that even with as high an interest rate as 9%, debtor claims to be able to temporarily fund a projected shortfall of $334,000 if

---

plan.

absolutely required. Debtor's Closing Brief, page 26, n.7; Exhibit "A" @ p. 34.

There are a few areas where the debtor, if pressed, could find the money to deal with projected shortfalls in the first year of the plan, 2011.  The Court, using the numbers found in debtor's Exhibit "A" to its brief @ p. 32, calculates debtor will experience a shortfall (described as ending cash balance) after spending all of its $200,000 available cash of about <$ 83,352> if the yearly debt payments to the bank are adjusted for a 8.5% rate ($2,156,759).  But these numbers assume that debtor will also pay $75,000[18] that year in legal fees which are identified in footnote (n.), Debtor's Closing Brief Exhibit B, p. 37, as "estimated professional fees relating to the Chapter 11 case and other matters." Of course, allowed administrative fees which are otherwise due upon the effective date can be postponed with consent of the holder. §1129(a)(9)(A). This alone is a $75,000 cash swing.  Similarly, management fees of $38,325, one supposes, might be deferred, at least in part, as necessary.[19] These two categories alone are a sum of $113,325. The debtor also notes that it did not count any recovery of accounts receivable and no collections from a "permanent vacancy" in its projections, and so if any of this turns to cash that should help.  Debtor's Closing Brief, p. 27, lines 24-28.  Of course, the debtor's principals, in the end, could come up with this relatively modest difference for at least the first year, which seems to be the only year in which a deficiency is projected, even assuming an 8.5% payment to the bank.[20] There appear to be ascending levels of available cash in years 2-7 of the plan according to debtor's projections, which includes an assumption that a new anchor tenant will be found by year two of the plan. This will be about 24-36 months from the date of the appraisals and seems to the Court a reasonable estimate. Even if the debt payments to the bank are adjusted to reflect 8.5%, the second year appears to be very close to break even, perhaps a very slight negative, with ascending cash balances available for years 3

---

[18] At page 24 of the debtor's Closing Brief the sum of $114,000 to the professionals and to the Franchise Tax Board is identified.

[19] The Court understands that at least some of the management is provided by Mr. David Klein, the son of Lucia Parks, one of the debtor's principals.

[20] It is asserted that Lucia Parks, principal and guarantor, has cash and cash equivalents of $415,000 as part of a net worth of between $6.2 and 7.9 million. Debtor's Exhibit "4", Hahn Declaration ¶36

- 15 -

through 7.  In sum, at 8.5% it will be *very tight*, particularly in the initial years, but just feasible (barely) according to debtor's projections, with the probability that professionals will have to delay payment of allowed claims, management forgoes some payments and/or the principals will have to subsidize operations in the first year or two. But debtor has in its Closing Brief expressed a willingness to utilize these avenues as necessary to promote this reorganization and the Court has every reason to believe this will happen.

Predictably, the bank attacks the projections and points out the many areas where the debtor's projections may be somewhat optimistic. But the Court is left persuaded that on balance the projections are more likely to be met than not, and that the debtor has access to sources of capital of the amounts probably needed to deal with minor shortfalls either through its principals or by delaying some payments and expenses where there is some leeway to do so under the plan. The bank cites to *In re SM 104 Ltd.*, 160 B.R. 202, 238 (Bankr.S.D.Fla. 1993) for the proposition that some cushion of money or "working capital reserve" is necessary in order for the court to find feasibility. But *SM 104* was a far more extreme case than ours. In that case the debtor proposed to eliminate all tenant and capital improvements (while maintaining a small reserve for repairs) not just for the initial year or two but for the whole ten year term of the plan. The *SM 104* court correctly noted that by making no tenant or capital improvements for ten years it would be unlikely that the debtor could maintain the building in good enough condition to attract tenants. *Id.* at 236-37.   In contrast, in our case the projections include hundreds of thousands each year for such items as architect fees, common area maintenance, and replacement reserves. Moreover, the debtor's projections include disbursements for new loans to build out the empty spaces and for the requirements of the projected replacement anchor tenant. In sum, there is little comparison between *SM 104* and the case at bar; while it is of course preferable to see a cash cushion in excess of all projected needs, this is not the kind of bare skin and bones attempt to ignore the realities of commercial leasing which was presented in *SM 104*.

There is also the issue of the projected refinance at the end of year 7 under the plan. First, the Court notes that plans that provide for such a refinance or sale at the end of their term are not unusual. *See, e.g., Boulders,* 164 B.R. at 105, *citing In re James Wilson Assocs.*, 965 F. 2d 160 (7th Cir. 1992); *In re SM 104 Ltd.*, 160 B.R. at 239. If the projections show that there will be a sizeable paydown of the loan or accumulation of substantial cash which will assist the refinancing on favorable terms, this can be sufficient for a finding of feasibility. *SM 104 Ltd.* at 239, n. 67-69, *citing In re Manion*, 127 B.R. 887, 890-91 (Bankr. N.D.Fla. 1991) and *In re ROPT Ltd. Ptsp.*,152 B.R. 406, 410 (Bankr. D. Mass. 1993). Here, the projections show that at the end of year seven there should be something like $4 million left in accumulated cash even after new construction and after servicing the bank debt at the 8.5% rate. Even if the property has not appreciated a penny over the $31 million stabilized value in that period (a rather dubious assumption given the longer span of real estate history), and even assuming a similarly adverse credit market such as prevails today, it would still seem that refinancing of a $21 million balance with a then fully-built power center and a track record of payment performance since 2010[21] should be very feasible since this would be only a 67% loan to value loan. In sum, this plan is more than just the hopeful "wing and a prayer" that the bank argues in its Post-Trial Brief.

"Feasibility" does not mean certainty. The standard has been interpreted in the Ninth Circuit to mean that the plan has a "reasonable probability of success." *In re Acequia, Inc.*, 787 F. 2d 1352, 1364-65 (9th Cir. 1986). The "feasibility" standard has been interpreted as excluding "visionary schemes." *In re Pizza of Hawaii, Inc.*, 761 F. 2d. 1374, 1382 (9th Cir. 1985). But, *possibility* of failure is not fatal. *Hobson v. Travelstead (In re Travelstead)*, 227B.R. 638, 651 (D. Md. 1998). The issue is primarily one of fact so long as the debtor presents evidence that it can reasonably accomplish what is promised in the plan. The Code does not

---

[21] The additional value of establishing an ability to service debt as an aid to refinancing was noted in *In re SM 104 Ltd.*, 160 B.R. 239, n. 69.

require debtor to prove that success is inevitable or assured, and a relatively low threshold of proof will satisfy §1129(a)(11) so long as adequate evidence supports a finding of feasibility. *Computer Task Group, Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 191 (B.A.P. 9th Cir. 2003), *citing In re WCI Cable, Inc.*, 282 B.R. 457, 486 (Bankr. D. Or. 2002) and *In re Sagewood Manor Assocs. Ltd.*, 223 B.R. 756, 762 (Bankr. D. Nev. 1998); *General Elec. Credit Equities, Inc. v. Brice Road Dev. LLC (In re Brice Road Dev. LLC)*, 392 B.R. 274, 283 (B.A.P. 6th Cir. 2008). The Court finds that the plan more likely than not can be performed as promised and that it is therefore feasible and complies with §1129(a)(11).

### 6. Conclusion

The debtor's Second Amended Plan complies with all of the applicable provisions of §§1129(a) and 1129(b)(2)(A). The objection will be overruled and the plan will therefore be confirmed, as modified. The interest rate payable to the bank shall be not less than 8.5% per annum, fixed, and the non-material amendment offered in the debtor's Closing Brief at page 23 concerning payment of all proceeds to the bank in the event of sale of portions of the property, may be included in the confirmation order, without re-balloting.[22] Debtor is directed to submit an order consistent with this Memorandum of Decision, which Memorandum will also serve as findings in the case as may be required under FRBP 9014, 7052 and Fed. R. Civ. P. 52.

###

DATED: June 21, 2010

*Theodor C. Albert*
United States Bankruptcy Judge

---

[22] As stated at footnote 5 above, however, any attempt to alter the Lucia Parks guaranty is not immaterial and may, in fact, be impermissible as a matter of law as a non-debtor discharge.

**NOTE TO USERS OF THIS FORM**:

**1)** Attach this form to the last page of a proposed Order or Judgment.  Do not file as a separate document.
**2)** The title of the judgment or order and all service information must be filled in by the party lodging the order.
**3) Category I.** below:  The United States trustee and case trustee (if any) will always be in this category.
**4**) **Category II.** below: List ONLY addresses for debtor (and attorney), movant (or attorney) and person/entity (or attorney) who filed an opposition to the requested relief. DO NOT list an address if person/entity is listed in category I.

# NOTICE OF ENTERED ORDER AND SERVICE LIST

Notice is given by the court that a judgment or order entitled (*specify*) _____CORRECTED AMENDED MEMORANDUM OF DECISION ON CONFIRMATION OF DEBTOR'S SECOND AMENDED PLAN_____ was entered on the date indicated as "Entered" on the first page of this judgment or order and will be served in the manner indicated below:

**I. SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (**"**NEF**"**)** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s), the foregoing document was served on the following person(s) by the court via NEF and hyperlink to the judgment or order. As of June 21, 2010, the following person(s) are currently on the Electronic Mail Notice List for this bankruptcy case or adversary proceeding to receive NEF transmission at the email address(es) indicated below.

Thomas H Casey     msalustro@tomcaseylaw.com
Ashleigh A Danker    adanker@kayescholer.com
Beth Gaschen     bgaschen@wgllp.com
Jeffrey I Golden     jgolden@wgllp.com
Peter J Gurfein     pgurfein@lgbfirm.com
Michael J Hauser     michael.hauser@usdoj.gov
John T Madden     jmadden@wgllp.com
Elmer D Martin     elmermartin@gmail.com
Hutchison B Meltzer     hmeltzer@wgllp.com
Mary E Olden     molden@mhalaw.com, akauba@mhalaw.com
Christina M Padien     cmoore@akingump.com
Evan D Smiley     esmiley@wgllp.com
United States Trustee (SA)     ustpregion16.sa.ecf@usdoj.gov

☐ Service information continued on attached page

**II. SERVED BY THE COURT VIA U.S. MAIL:** A copy of this notice and a true copy of this judgment or order was sent by U.S. Mail to the following person(s) and/or entity(ies) at the address(es) indicated below:

North Valley Mall, LLC
24532 Del Prado
Dana Point, CA 92629

☐ Service information continued on attached page

**III. TO BE SERVED BY THE LODGING PARTY**: Within 72 hours after receipt of a copy of this judgment or order which bears an "Entered" stamp, the party lodging the judgment or order will serve a complete copy bearing an "Entered" stamp by U.S. Mail, overnight mail, facsimile transmission or email and file a proof of service of the entered order on the following person(s) and/or entity(ies) at the address(es), facsimile transmission number(s) and/or email address(es) indicated below:

☐ Service information continued on attached page